ROANE, Judge.
In this cause, two questions occur:
1. Whether the descent law of 1785 was in force, or not, at the time of Wm. Allen’s death, which happened in 1783?
2. Whether the statute, respecting, wills, of 1785, operating upon the will of the said Wm. Allen, will pass his lands acquired after the date thereof?
As to the first question; it was rightly conceded *by the appellant’s counsel, that it was concluded by the decision of this Court in the case of Proudfit v. Murray, 1 Call, 394. That decision revokes the effect of the repealing act of 1792, until October, 1793, by construing both the repealing and suspending acts to relate to the first day of the session, and thus to commence their operation together. This construction was made under the common law doctrines upon this subject; and the rule governing in that case was resorted to, in consequence of another act having rejected the rule laid down in the act concerning elections in relation to two acts passed during the same session.
This rule of construing a statute to operate by relation, taken in its full extent, is certainly often retrospective, and productive of the highest injustice. It has accordingly been changed in England (as well as here,) by stat. 33, Geo. 3, ch. 13. In the case of Proudfit v. Murray, however, as well as in this case, it had no retrospective operation; for, the contract in that case, as well as in this, arising posterior to the passage of the relating acts and probably posterior to the rising of the Assembly, I believe I shall be warranted by my colleagues in saying (for I did not sit in the cause) that the decision in that case was not meant to extend to a mesne act happening between the first day of the session, and the times of passing the act so relating. This would be to render a contract lawful at the time, or an act then innocent, the one unlawful, and the other criminal, by relation 1 Such a doctrine is contrary to the general nature of a statute, which is prospective in its operation: and it may well be questioned, whether a doctrine of the common law, so replete with injustice, and so inapplicable to the circumstances of any people professing to be governed by existing laws, can be adjudged to have been *519 adopted by the ordinance of 1776? It is true, this evil will the seldomer occur, as that rule of the common law is now confined to the case of two statutes passed during- the *same session: But, it may yet sometimes occur, as is supposed; and, whensoever it does, it will deserve great consideration, before the Court can sanction so retrospective, and iniquitous a construction.
Had this decision of Proudfit v. Murray, not settled the question, I should have wished to have further considered, whether a statute, not differing from a former one, but merely iterating the provisions of it, and containing a repealing clause, can be said to repeal the former? At present, I see considerable force in the Chancellor’s ideas on this question; but, I wish not to pre-judge it.
As to the second question : It is admitted, that a testament of personal estate speaks not until the death, and that after-acquired chattels do pass. Whether this doctrine was transplanted into England from the Roman law, or not, it is immaterial to enquire. Perhaps, however, it was; and the Courts in England assign a cogent reason in support of it, as applicable to chattels, arising from the fluctuating nature of that kind of property. 1 P. Wms. 240. But, that reason does not hold in relation to land, which is more permanent, and with respect to which the testator may more easily keep pace, by varying his devises. Besides, this doctrine of the Roman law was interrupted in England, as relative to lands, by the doctrines of feudal law, on the subject of non-alienation: And, when testamentary alienations were permitted by statute, the}' were considered, not as a constitution of a general heir, but as a limitation of the testator’s estate by a revocable act. [Swift v. Roberts,] 3 Burr. 1496: And as an appointment of particular lands to a particular dev-isee : But, a man cannot appoint to another, lands which he has not. [Harwood v. Goodright,] Cowp. 90.
The appellant’s counsel was mistaken in supposing, that the decisions, relative to land, turned upon the word having, in the statute of wills, as *may be seen in Cowp. 90; where it is also observed, that the same construction had taken place upon the custom, before the statute.
These two decisions, therefore, constitute the grounds of the criterion, between the two kinds of property. As to that impediment which arose from the feudal system, there could certainly be no objection, with the Eegislature, to get over it: But, the other reason, arising from the fluctuating and transitory nature of personal property, does not hold as to land; and there is still the less necessity to extend the rule to that kind of property, by construction, since the equitable laws of descent lately enacted. It was enough for the Eegislature to au-thorise a disposition of after-acquired lands, by devises evidently contemplating such property. Eurther they have not gone: And, as the will now before us does not evidently contemplate after-acquired lands, I am of opinion, that the decree should be affirmed.
EEEMING, Judge.
Three points were made by the counsel for the appellant in this cause: 1st. Whether, during the period between the 8th of December, 1792, and the 1st of October following, the common law was restored, so that the lands devised by William Allen the father, to his son John, (the devise having become ineffectual by the death of the son, living the father,) descended on the appellant as his eldest son and heir at law, in exclusion of his sisters? 2d. Whether the lands acquired by John Allen, after the date of his will, passed by the devise of all his estate to his father; and from him (whether his title were by descent or purchase,) to the appellant under that clause of his will, which gives all his lands in the counties of New Kent and James City to his son William? and, if not, then 3d. Whether the appellant is entitled to a moiety of them under the residuary clause of his father’s will?
*The first point having been fully considered in Proudfit v. Murray, 1 Call, 394, was but slightly mentioned by the appellant’s counsel; but, it may not be amiss to make a few observations on it, in order to shew my entire concurrence in the principle established in that case. The position contended for by the appellant’s counsel, is, that the act of 1789 having declared, that whensoever one law, which shall have repealed another, shall be itself repealed, the former law shall not be revived, without express words to that effect; and, therefore, as the act of 1785 had been repealed by the act of the 8th of December, 1792, it was not revived by that of the 20th of the same month; but, there being no statute in the way, the common law rule of primogeniture was restored. This argument, however, involves its own destruction ; because, if the act of 1785 was not resuscitated by that of the 20th of December, 1792, no. more could the rule of primogeniture: for, that had been as completely abrogated by the act of 1785, as the latter was by the act of the 8th of December. Besides, it may be a question, whether those parts of the act of 1785, which were re-enacted into that of the 8th of December, were repealed by the latter, since the will of the Eegisla-ture remained the same. But, be that as it may, surely that construction would be a strange one, which should allow that the repealing clause of the act of the 8th of December, should alone continue in force, whilst the operation of ever}' other part was suspended, by that of the 20th. It would certainly be fairer to say, that the operation of all, or none of it, was postponed. Agairi, it is a rule, that all statutes on the same subject, should be taken as one law; and, construing the acts of the 8th and 20th of December by that rule, the suspending act must be considered as annexed to the other, immediately after the repealing clause: In which case, the act of the 8th of December will not operate at all, until the expiration of the suspending act; and, consequently, the act of 1785 will con-iinue in force, *until the 1st of October, 1793. This construction supports the evident will of the Eegislature, and puts an end to the discussion on the first head.
With respect to the second point: The *520 Neck of Land tract did not pass by the will of John; because, it was purchased by him after the making' of his will, and both the will and purchase were made prior to the passing of the act of 1785, and, therefore, could not be affected by the subsequent provision of that act, enabling the testator to dispose of all the lands which he has, or may have, at the time of his death. But, that circumstance does not alter the case; because, the rights of the parties to this suit will be the same, whether William •Allen the father, took them by descent, or purchase, from his son John. The question then is, whether they passed by the will of the father? The act of 1785, only gives a power to devise after-acquired lands, leaving it to the discretion of the testator to dispose of them or not: Consequently, in order to produce that effect, there must be something indicating an intention to exercise the power. But, in the present case, the testator could not have intended to devise to his son John, those lands which he was to acquire from him, by descent. Such an idea was too absurd to have entered into the head of any man in his senses. Of course, the after-purchased lands did not pass by the will of the father.
With respect to the third point: It is extremely clear, that this moiety did not pass under the residuary clause of the father’s will; because that was intended to pass only what was not given before; but, this moiety was expressly given to John, and, therefore, could not be comprehended under the residuary clause. The consequence is, that, as the devise to John failed by his death in the life-time of the testator, this moiety descended on the female plaintiffs and the defendant, as .the heirs of the father.
*1 am, therefore, of opinion, that the decree of the Court of Chancery is right, and ought to be affirmed.
PENDLETON, President.
We have to lament that the Court is so thin, on the decision of a question so important to the parties, and the community, as well, because we are deprived of the able advice and assistance of two of our worthy brethren, as because, if they had accorded with us, it would have given additional sanction to the precedent: On which account, we should certainly have forborne to hear the cause, if we had not been informed, that the Judge who is absent (as well as him who is present) would have retired from the discussion. We have, however, this consolation, that we all agree in opinion, and indeed have had very little doubt upon the question.
The case is shortly this: William Allen, by his will, dated September 4th, 1789, having devised sundry personals to different legatees, and several tracts of land to his two sons, John and William Allen, devises “all the rest and residue of his estate, of what nature or kind soever, to his two sons, to be equally divided between them,” and appointed them his executors. He lived till July, 1793; and in the mean time, his son John died without issue; by which a considerable estate, consisting of the lands, the subject of' the present controversy, (called Neck of Land and Robinson’s Quarter,) and a number of slaves, came to William the father, whether by his son’s will, or as heir at law, is immaterial. It is admitted, that the slaves and personals were comprehended in the residuary clause in the father’s will, so as to give the son William a moiety thereof; but, as to the lands, it is insisted, that they did not pass by that clause, but descended to the testator’s heirs at law; and, such being the Chancellor’s decree, the appeal brings that question before this Court. Por, as to the several estates devised to John, it is agreed the bequests became lapsed *by his death in his father’s life-time ; and the estate was distributable to the testator’s heirs. The rule in England is, that as to lands, a testator is supposed to speak at the date of his will, and therefore, although he shall devise all the lands which he may have at his death, any lands which he may acquire after the date of his will do not pass, but descend to his heirs; but that, as to personals, he is supposed to speak at the time of his death, and a general residuary devise will comprehend all his personals, without enquiry when they were acquired. There was much labor at the bar, to shew from what sources this distinction was derived, which appears to me not material. If it was so, my impressions are, that the distinction proceeded from the nature of the property. Lands are visible and durable, and their acquisition being by written conveyance, no difficulty occurs in ascertaining the time it takes place. Besides being valuable, they were on the English policy, considered as a natural fund for the heir; and that after-purchases were not meant to be comprehended in a general devise. The rule being established, when, in Bockenham’s Case, [Gilb. Dev. 138; Bunter v. Coke, 1 Salk. 237; Pow. on Dev. 1 vol. 197, 2 Lond. ed.] there was a devise to all the lands he then had, or should have, at his death, there was great labor to make the rule bear upon that case, from the word having in the statute of wills, and other observations; but, the decision applied the rule to that case.
On the other hand, personals were, when the rule was established, of inconsiderable value; in their nature perishable and mutable; the property transferred by mere change of possession, without written conveyances, and in secret, rendering it difficult, if not impossible, to ascertain the time of its acquisition, whether prior or subsequent to the date of the will. It was on this transient nature of personals, that another common law rule prevailed, forbidding a division of interest in them, which was permitted in the case of real estate. A donation for an hour, passed the whole property, not allowing any remainders *or reversions to operate. But, whatever was the source of its foundation, the.rule, as it came to us from England, was well understood, and established the distinction I first stated, that, as to lands, the testator speaks at the date of his will; and, as to personals, at his death.
It is certainly true, that the Revolution produced a great change in our system, but *521 not so broad as was contended for by Mr. Wickham, so as to put all transfers of property, whether real or personal, upon the same ground. The change was principally confined to the case of descents and distributions ; a difference being still preserved in the disposition of property, either by deed in the person’s life-time, or by will. Lands can only pass by a particular mode of conveyance; personals still by mere transmutation of possession: Lands pass only by a will in writing, subscribed by two witnesses, or written by the testator; personals may be disposed of by any will, written or nuncupative: And, if the diffusive spirit of the law of descents be recurred to, setting aside the rights of primogeniture, and calling to the succession all who are in equal degree of kindred, it will seem to oppose Mr. Wickham’s doctrine, by letting in those collective heirs, instead of giving the estate to a particular residuary legatee; a spirit, which also dictated the abolition of all estates tail, in order to extend the power of alienation, and, in cases of descents, to bring all our lands within the operation of the new system.
Having made these general preliminary observations, I proceed to consider what the Legislature have directed in the case under consideration. The words of the clause are, “That every person aged twenty-one years or upwards, being of sound mind, and not a married woman, shall have power, at his will and pleasure, by last will and testament in writing, to devise all the estate, right, title, and interest, in possession, reversion *or remainder, which he hath, or, or at the time of his death shall have, of, in, or to lands, tenements, or hereditaments, or annuities, or rents charged upon, or issuing out of them.” With respect to the present will, it was truly observed to be very absurd to suppose that the testator meant to devise to John and William, lands which would come to him from John by his death : A full proof, that he did not mean to comprehend them in his residuary devise: And, since the intention of the testator is to be the governing principle of construction, it might be sufficient, upon that ground, to affirm the Chancellor’s decree, in the present case. But, to settle the question in cases where that objection may not occur, the Court proceeded to consider it as a general question. If the Legislature had intended to abolish, wholly, the distinction in England, they would certainly have declared that every testator should be considered as speaking in his will at the time of his death, as well respecting his real, as his personal estate; and thus have put an end to all controversy about it: Instead of which, they have only varied the rule as to lands, sub modo, that is, by giving testators a power which they may exercise or not, at their will and pleasure, to dispose of their after-purchased lands; meaning, as it appears to me, to meet the desire in Bockenham’s Case, where a man shall devise all the lands which he shall have at his death; but, not further interfering with the rule: And, to me it seems to have been done with great propriety; since such an extensive clause shews the testator to have contemplated any after purchased lands he may acquire, and that they shall pass to his devisee; whereas, without such clause, he will appear to have had in view only his present possessions, leaving future acquisitions to future provision, or to the disposition of the law: And, therefore, where the power given by the act is not exercised by such a clause, as is the present case, the rule operates, and after-purchased lands will descend to the heir at law. It follows, *that I am of opinion with the other Judges, that the decree ought to be affirmed.